Morgan Christen, N.A. Circuit Court of Appeals Good morning and welcome to the Ninth Circuit Court of Appeals. My name is Morgan Christen. I'm one of the judges on the Circuit Court. My chambers are in Anchorage, Alaska. But I'm delighted to be sitting this week in San Francisco with my colleague, two of my colleagues from the Circuit Court. My colleague on the right is, well, your left, is Judge Bress, whose chambers are here in San Francisco. And Judge Van Dyke on my left, your right, whose chambers are in Reno, Nevada. I have just a little bit of housekeeping before we begin. There are a number of cases in which, no, there aren't. There's just one case that we've submitted on the briefs. And I need to note for the record, case number 24-4911 will not have argument in that case today. The first case on the oral argument calendar is 24-4498, Milliken v. Bank of America. Counsel, we are ready to hear your argument. Good morning, and may it please the Court. I'm Claire Tonry here on behalf of Plaintiff Appellant Austin Milliken. I will attempt to reserve three minutes for rebuttal. This case presents a straightforward question of statutory interpretation of the CARD Act, a law that Congress passed to curb abuses in the credit card industry, abuses including the practice of raising interest rates on credit card balances that were already incurred at a lower rate. This is something that Congress found to be an unfair, misleading, and deceptive practice that causes significant, unavoidable injury to consumers. There are exceptions, but they are narrow in order to preserve and protect consumers from the abuses that motivated the CARD Act in the first place. The exception that's at issue here is for rates that vary, quote, according to the operation of an index over which the creditor has no control. And this was designed to allow banks to pass on their own increased cost of borrowing to credit card consumers. When you talk about this being a case of statutory interpretation, right, I think you want us to be looking at B-2? Correct.  So the difficulty I have with your argument, this part of your argument, is that it the statute speaks to an index that's not under the control of the creditor. Of course, you're talking about the prime rate, which is not under the control, and you don't argue that it is. I understand your argument to be that there's another variable at play here and that that is under Bank of America's control. That's correct. Okay. Oh, please, go ahead. I was just going to say that we have two components to our statutory interpretation argument.  And the first is that the Bank of America's practice doesn't meet that first portion, which is that it needs to vary. Their rates need to vary according to the operation of the index. And then the second argument is that their practices exceed the control limitations on banks. But please go ahead. Well, at the top of the argument, you said this is a case of statutory interpretation. I understand you're making an argument that this is a consumer protection statute and that the way that Bank of America is applying this variable interest rate is not consistent with consumer protection. But you're confusing me a little bit because my understanding is that you're focusing on the statutory interpretation, and I don't see anything in the statute that prevents Bank of America from doing what they're doing. Let me please explain.  As to the first component, the changes to their interest rates need to be according to the operation of an index. We look at what the plain meaning of those terms is in that statute. So we do that within the constraints that this is narrowly construed because it's an exception to a remedial statute. But even putting that aside, there are multiple lines of authority that show that the statutory phrase, according to the operation of, and the regulatory phrase due to, mean that the bank cannot increase rates before the index increases. You're sweeping in the way they apply the prime rate with those words, right? You're sweeping that in is my understanding. Exactly. Yep. Okay. Exactly. And so specifically, the case law shows that the phrase according to the operation of an index means that it's determined solely by that index and no other variable. We've cited multiple cases to that effect, and Bank of America has not rebutted them or distinguished them in any meaningful way because those cases were interpreting the exact phrases or almost substantially similar phrases as a matter of law. So those cases are applicable here, and they show that the index needs to be the variable, outside variables cannot come in to the equation. Case law also makes clear that the phrase, the regulatory phrase due to, signifies causation. And, of course, we all know that a cause must precede its effect. And so, in other words, the index increase has to precede the bank's increase to meet the variable rate exception. And this just fundamentally makes sense because there's a temporal aspect, and it's critical to how an index operates, which, again, is the statutory language. It needs to operate according to the index. An index is not just a percentage rate in a vacuum. It has a temporal component as well. So when the Wall Street Journal publishes the prime rate, it gives the effective date of the rate. But Bank of America's practices disregard this temporal component. Sometimes that can benefit the consumer and sometimes not. It depends on whether the rate goes up or down. That's correct, but the CARD Act is concerned solely with increases. Right. Which is why it seems to me your strongest argument is that this is a really, at bottom, a consumer protection statute. Can I ask you, what weight do we put on the commentary for the Consumer Financial Protection Bureau? How does that factor in? There are only a few aspects of the commentary that bear on the exceptions, and those, the commentary is entirely consistent. I would point the Court to the commentary to .55B that talks about applying interest rates that have an effective date, changes to the rate, and specifically says that banks cannot apply interest rates, backdate them before the effective date of a change in the interest rates. I'd like to ask you about that example, if I could. It talks about this hypothetical where, is that what you're referring to, where rate jumps from 15% to 18% on June 15th?  And this hypothetical example says that the bank would be free to apply the higher interest rate, not before June 15th, because the rate didn't change. So they apply the 15%, the lower rate up until June 15th, and the higher rate going forward. That's why I'm asking the question. I have two questions about that. One is, how much weight do we give that commentary? And the other is, it's a little, on an iPad, it's a little disembodied, so I can't tell whether that commentary is specific to the provision that we're interpreting. That commentary pertains to all of the exceptions to the CARD Act, so it's an overarching piece of commentary. I will point out that throughout the other commentary, including everything that Bank of America cites, there's not a single example that indicates that a bank can backdate rate increases before the index increased. And if there was, Your Honor, it would conflict with Congress' intent and plain language in the CARD Act, and that, of course, controls.  So you're coming up on three minutes, so could you answer the other part of my question, and then I want to get out of the way, because there may be other questions from the other judges. But how much weight do we give that commentary? I think we give the weight that's persuasive, but, of course, this Court has to make its best interpretation of the plain language of the statute as of the first instance. And so I think that that is absolutely what controls here.  You wanted to save some time. Let me just check to the rest. Maybe if I just have one question.  So how do you think this should actually operate? Because the rate is going up and down every day, so should the credit card rate therefore also change every day? No, Your Honor. I don't think that that's accurate. The prime rate is not going up and down every day. It's published, but the changes are not very frequent at all. We've got 11 increases in the span of, I think, under a year and a half that are at issue in this case. But when the statute says, according to the operation of an index, what point in time do you want that keyed to? Because your position is it can't be keyed to the last day of the month if the billing cycle begins earlier in the month. So what should it be keyed to? So, Your Honor, it can be keyed to, they can essentially take the temperature of the index at any point prior to when they're going to implement the changes. And the regulations and the guidance make that pretty clear. They can choose to pick a date at the end of the month, whatever it is. But our contention in this case, what's essential, is that it cannot be applied to balances before, and this could be up to 90 days before, before the actual rate increases. So it's the backdating component relative to the change in the index and the application of it that's the problem here. So on your view, why wouldn't it, I mean, if the rate was set, just say on day one and the rest of the billing cycle goes forward and then the rate goes down, the published rate goes down, would you not claim that your clients should get the lower rate as the rate goes down over the course of the billing cycle? The CARD Act doesn't give, certainly consumers would prefer that the rate goes down immediately. But the CARD Act only is concerned with increases. And we're concerned here only with retroactive backdating of increased rates. And the regulations also make clear that the bank can either apply the change in the rate on the day that it occurs, so that could be mid-cycle, or the regulations protect the bank's ability to make that change in the next billing cycle and they're not precluded from taking advantage of those changes. There is no similar provision for backdating the rate increases. And unless Your Honors have any other questions, I'll reserve the rest of my time. That's okay for now. Thanks. Okay. Thank you. That's all right. When you come back, you can plan that. We'll put two minutes on the clock. I took a lot of your time with questions. Thank you. Good morning, Your Honors. May it please the Court. I'm Danielle Morris of Melvin E. Myers. I'm here on behalf of Bank of America Diapoli. Without the variable rate exception, the CARD Act prohibits applying increased interest rates to purchases and balances that were due in owing before the rate increased. That's without the variable rate exception. That's in Section 1661i1, which says, in general, in the case of any credit card account under an open-end consumer credit plan, no creditor may increase any annual percentage rate, fee, or finance charge applicable to any outstanding balance except as permitted by the variable rate exception. The one thing that Bank of America agrees with the appellant about is that this is an issue of statutory interpretation, and specifically, the variable rate exception, the text of the variable rate exception, permits the conduct that Bank of America is alleged to have taken here. The text of that exception, the increased rate is in accordance with a credit card agreement that provides for changes in the rate according to operation of an index that is not under the control of the creditor and that is available to the public. Bank of America's credit card agreement describes precisely how it applies changes to the interest rate. It's in ER pages 34 and 35. The index that triggers Bank of America's interest rate is the U.S. prime rate, which the appellant does not allege is under the control of the bank, and the U.S. prime rate is available to the public, published in the Wall Street Journal. The only issue is whether the fact that Bank of America uses the prime rate as of the last date on which it's published in the month to apply to the balances applicable to that credit card each day for the same billing cycle in which that rate changed. Appellant argues that according to operation of an index means that a card issuer can apply the new rate to the card balance, but only as of the date of that rate change, cannot apply it to any preexisting balances. If Congress had meant that the increased rate could apply only as of a particular date, regardless of the bank's ability to choose the index based on a particular date in the month, it could have and would have said so. It did not do that. There is no provision in the variable rate exception that says, for example, you may increase the rate provided that the rate change goes into effect as of the date that the index is published. So you're in response to the backdating argument, your point is this whole thing is an exception for outstanding balances? That's what this covers? Precisely, Your Honor. The variable rate exception is to — it is an exception that allows rate changes under certain circumstances. The — there's a rate change, and then there's a temporal limitation on when that rate change goes into effect. The variable rate exception addresses the rate change, not the temporal effect. The temporal effect is set in the statute itself, from which the provision, 1666i-1, which says you cannot apply increased rates to previously existing balances except. So the except is, here's how you have to change the rate. And they say you can trigger it off of the U.S. prime rate, which is done here, as long as you're not controlling that rate and you tell people what you're going to do, which Bank of America did. They triggered off the prime rate. They followed the variable rate exception. And what Congress said was when you do that, temporally you can apply that rate to the previous charges.  So you want us to look at subpart A of the statute? Both, Your Honor, subpart A and subpart B. Subpart A is what says that we're talking about the universe we're talking about is the universe in which a rate may change as to an outstanding balance. Correct. And so that's the important context to keep in mind here, which is to say we are giving you circumstances in which you can apply increased rates to outstanding balances. These are those circumstances. But the plaintiffs say, well, listen, you could really extend the billing cycle, including up to 90 days, and there's maybe a lot of fluctuation in the rate that would happen over that period, and would that be a problem? It wouldn't be a problem because the safeguard on that is that billing cycles can't exceed 90 days. At the time that the CARD Act was implemented, we saw in the congressional history that there were banks that were using 90-day billing cycles, and while that still permitted, many of them, such as Bank of America, have shifted to a shorter billing cycle. It's more consumer-friendly. It is more consumer-friendly when rates increase to use a 30-day billing cycle. When rates decrease, obviously not. And as Your Honor pointed out, this practice applies regardless of whether the rate increases or decreases. So I do believe that there is a safeguard to protect against an abusive effect here that was set in place to say that billing cycles can't exceed 90 days. They don't exceed 90 days, or they don't exceed 30 days here. That's the practice that is challenged. But I do believe that, and Congress saw, that 90 days was an effective limiter there, and the CFPB implemented regulations to that effect. So the 90-day limit comes out of regulation? Out of regulation, yes. That's a CFPB regulation. Well, so on accordance with, it seems like there's like three different interpretations. That seems to be the key part of the statute. And it seems like their position is, in accordance with means it has to happen after. So temporally it has to happen after. Accordance with, at the other extreme, I think, and the other extreme would just be like nothing at all, but ignore that. The other extreme would be in some agreement you say, we will pick the rate we want to use from the past 10 years, and we will change it in accordance with that. But you're not doing that either. You're kind of in the middle. You're saying you have a almost like algorithmic automatic where you tie to a rate. You just don't tie to a rate necessarily that's always in the future. So that seems to be kind of in the middle. So if you have these three positions, accordance with would just mean, yeah, we're doing it in accordance with. We're picking a rate out of the prime rate, and you say your agreement said you could do that just randomly. We pick the one we want to pick, which is not what you're doing. Or theirs is it has to be the rate as of that day that you can't ever backdate a rate. And the other would be you can pick a rate and you have a formula, and you tell them what the formula is. That seems to be your position, and so it can be backdated if you want to call it that. Why is your position the best of those three alternatives to pick? It is the best of those three alternatives because it is the one that most facilitates explaining to a consumer what is being done in the credit card agreement so that they can make an informed decision about whether they want to use that credit card. Is your position that you couldn't? You're not doing this, but that you couldn't have an agreement that says we're going to pick a rate, so it's a published rate, and we're going to tell you what we're going to do, but we will pick a rate that is the rate we want to pick from the past three years, say, right, which presumably you'd always pick the rate that was most favorable to you, the highest rate. Would that be? So yours may be backdated, but at least it moves. You know, whereas if you did that, you'd just be kind of getting it. Would that be in accordance with or not? I think it depends, Your Honor. And there's a piece of your hypothetical that may be critical here. It would not be permissible under our reading of the statute for a bank to change what it picks kind of on a whim. It would not be permissible, and I think the commentary suggests it would not be permissible. Yes, that's what I'm getting at. I'm saying, like, it still wouldn't in theory be in accordance with because you would be pulling a prime rate, but how much backdating, to use their language, you were using or how much forward dating would kind of be at the bank's whim? And your position, it sounds like, is, yeah, that would not be in accordance with because there would not be an identifiable formula that the consumer would know. Is that why? It is certainly not the bank's position that it would be permissible for the bank to be able to change the dates on which it is tying to the index. So your argument turns on that in accordance with, it is in accordance with when, even if it's backdated, to use their phrase, as long as it's a consistent sort of, the way that it's consistent. So is your position that what if you, we will do it in accordance with the prime rate of six months ago, six months ago from the last day of your billing cycle, could you do that? I think if the hypothetical is that the contract says we will always trigger off of the index rate as of the date six months prior to, I think that would be permissible because a consumer could. So the temporal thing, you know, they say it's got a temporal component. I think your answer to that would be, well, as long as we're consistent and we tell you what we're always going to do, I mean, you could say the prime rate plus ten or something if you wanted to, so. I think there are two, I think we're talking about two separate temporal issues. One is the date as of which we can look at the index. And the other is the date as of which we can apply the increased interest rate. It is not the bank's position that we would be able to apply the increased interest rate, you know, forever back in time, right? We're only applying the increased interest rate to the balances in that single billing cycle. So I think to answer Your Honor's previous hypothetical, we could say we're going to pick the we're always going to trigger off the index as it exists on January 30th. Let's say we're only going to pick one for the year. But when we make that change, we're going to apply it to the balances that we're going to make that change. Because your view is that would be in accordance with, but it would not be in accordance with if you just got to randomly pick the one that, I mean, you'd still have some constraint on your decision making because you'd have to be tied to some prime rate. You couldn't just go pick a number out of the air. But you think accordance with has got to be tied to have a formula, a previously disclosed formula that tells you, and the length of time doesn't matter so much as to whether you're picking a date three months earlier, three months later, as long as it's consistent. That's correct. It must be clearly disclosed to the consumer, and it must be consistent so that the consumer can make an educated decision about how their card is going to operate. Judge Price? It looks like you are over your time, and we're out of questions.  But we want to thank you for your presentation. We're just going to put two more minutes on the clock as rebuttal for opposing counsel. Thank you, Your Honors. Thank you. Thank you, Your Honor. I think that Your Honor began to key into some of the problems here, which is that while Bank of America says that it doesn't do certain things or that maybe some things are limited, it doesn't have a limiting principle in its statutory interpretation. It could be 90 days, backdated, they admit. So nothing in their statutory construction puts any guardrails on that. I think their argument was, if you follow it, there are guardrails in the sense of I think their position is you could be 90 days different, you could be six months different, you could pick one prime rate as a specific day every year and apply that for the whole year. Those would all be in accordance with, but what they are disclaiming that they would be able to do is just randomly, or at their discretion, maybe not random, at their discretion, pick the rate they want. And so that would not, in their view, be in accordance with. But as long as there is a formula that tells the consumer we are going to pick on the one three months earlier or that that is in accordance with, why is that not okay? So, again, Your Honor, I think that that gets to the separate issue of how they pick which rate they are going to apply. But we are concerned with a different problem, which is when they apply that rate change. Right. And so I think their argument is in accordance, and you are fitting that idea that that has to be only forward in the phrase in accordance with? Correct. And that is because it is in accordance with the operation of. An operation of means how the index, as a functional matter, how it operates, how it fluctuates. And there are two components to how the index operates. An index would, if it is just a I think their argument is that it is keyed off of it, right, in a predictable manner. That is how they are reading. And it doesn't seem that that is a crazy way to read in accordance with, as opposed to not only in accordance with, but it has to be always, it can never be applied before. So, again, the case law is pretty clear that there are, you know, they could have used other phrases that would be much looser, like the ones Bank of Florida is advocating for here, tied to as an example. But the language that Congress chose is according to the operation of. And all of this Court's case law and others interpret those as strict phrases. And because, again, it's a consumer protection statute, the exception also needs to be interpreted narrowly. If I may, I just want to point out that, and be crystal clear, that the strict interpretation that we are advocating for still gives full effect to the variable rate exception. Banks can still raise interest rates on outstanding balances. They can just do so prospectively from the time that the prime rate increases and it can pass on all of its increased costs of borrowing. But why would that be in the strict conformity? It seems to me if that, if what you're saying is right, then this other mechanism might also not be okay either, because if it's going to be strict, it would seem that it would have to rise and fall in real time. So as to the decreases, Your Honor, again, the CARD Act doesn't regulate decreases or mandate decreases. This provision only pertains to increases. But there's also a separate specific regulation that allows them to postpone decreases or increases to the next billing cycle. There's just no regulatory exception, much less statutory exception, that allows them to backdate increases. I see that I'm well out of time. Thank you. Yes, thank you for your arguments. We'll take that case under advisement and go on to the next case on the calendar.
judges: CHRISTEN, BRESS, VANDYKE